IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kimberly-Clark Mill,              :
                 Petitioner    :
                                  :
        v.                     : No. 1371 C.D. 2024
                                  : Argued: June 3, 2025
William Moss, Jr. (Workers'    :
Compensation Appeal Board),     :
                 Respondent   :

BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE WALLACE                        FILED: August 12, 2025

Kimberly-Clark Mill (Employer) petitions for review of the Workers' Compensation Appeal Board's (Board) opinion and order (Order) affirming the decision (Decision) of a Workers' Compensation Judge (WCJ) which granted William Moss, Jr.'s (Claimant) Claim Petition. After review, we affirm.

## BACKGROUND

Claimant worked for Employer for approximately 17 years as a machine operator and firefighter. Certified Record (C.R.) at 202.[1] On August 18, 2021, Claimant filed a Claim Petition seeking benefits under the Workers' Compensation Act (Act).[2] *Id*. at 8-9. In his Claim Petition, Claimant alleged he was electrocuted

---

[1] References to the certified record reflect electronic pagination.

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

while vacuuming at work on November 28, 2018. *Id*. at 9. Claimant asserted the electrocution caused him severe tremors. *Id*. Employer denied Claimant's allegation that he was injured at work and alleged Claimant's injuries were pre-existing. *Id*. at 16.

Claimant submitted testimony to the WCJ via an October 14, 2021 deposition transcript and testified at a hearing before the WCJ on July 14, 2022. *Id*. at 143, 197. In his testimony, Claimant explained he had previously been electrocuted at work in 2013, and afterwards, he experienced "shaking every once in a while." *Id*. at 212. Following the 2013 incident, Claimant was off work for the weekend but returned the following week. *Id*. Claimant indicated that after the 2018 electrocution, his tremors worsened. *Id*. at 218. Claimant explained he sought treatment from his primary care physician, Dr. Zoranski, who referred him to a neurologist, Dr. Farmer. *Id*. at 218-19. Claimant testified he received Botox injections from Dr. Farmer to help control the tremors. *Id*. He also stated he took an antiseizure medication. *Id*.

Claimant indicated he stopped working in February 2020, and he remained off work until November 2020. *Id*. at 222. Claimant then returned to work from November 2020, until January 2021. *Id*. Claimant testified he requested an accommodation from Employer to enable him to continue working, but Employer denied his request. *Id*. at 224. When asked what part of his job as a machine operator he was no longer able to perform in November 2020, Claimant explained:

> I was tremoring hard. I wasn't strong at all. I was in . . . physical therapy to try to build muscle mass because I can't lift any weights. I can't lift anything heavy, so I . . . did physical therapy for stretching, learn how to stretch the muscles so they're not hurting.
>
> But I couldn't pull. I can't lift. Sitting here- and I truthfully would like to stand, but I don't want to come off of my phone. But this is what happens, and this is what hurts all day long. It makes it to where your

2

> muscles cramp, and it looks like there's a frog jumping out of your leg or your chest and it hurts. It's just muscles jumping, and then I can't do anything after that. It's almost like working out. Right now my body is working out and I'm not working out. I just shake all day. So it's very impossible- it's very tiring.

*Id.* When asked if he felt capable of returning to his machine operator job at any time since January 2021, Claimant responded: "No . . . . Because I don't feel safe on the floor. I don't feel steady on my feet. I can't do the jobs I used to do and mentally, it [a]ffects me and physically." *Id.* at 234.

In addition to working for Employer, Claimant testified he owned a health and wellness business, and he went to the business's location every day. *Id.* at 230. He explained he had a bed and his medications at the business, and his wife was there to ensure he was safe if he fell. *Id.* He indicated that while he was there, he would primarily sit in a chair and occasionally answer questions from customers. *Id.*

In support of his Claim Petition, Claimant presented the testimony of Robert Sing, D.O. (Dr. Sing). *Id.* at 319. Dr. Sing is board certified in sports medicine, emergency medicine, and family medicine. *Id.* at 320. In addition to his family practice, Dr. Sing testified he served as the medical director for school districts, fire companies, ambulance companies, a youth club, and the Athletic Association, as well as a second opinion physician for the National Football League Players Association. *Id.* at 321.

Dr. Sing testified he first saw Claimant in September 2021. *Id.* at 328. According to Dr. Sing, Claimant presented with uncontrollable shaking and tremors of extremities, sometimes stuttering with a shaky voice, pain, muscle spasms, and chronic fatigue. *Id.* Dr. Sing testified that Claimant reported receiving an electrical injury on November 28, 2018, and after that injury, he experienced tremors and muscle spasms so pronounced that he had significant difficulty using his hands to

3

perform manual tasks. *Id*. at 329. Dr. Sing explained he examined Claimant and found Claimant had significant muscle spasms and tenderness over the cervical spine extending into the upper dorsal area and to the bilateral trapezius musculature. *Id*. at 329-30. Additionally, Dr. Sing indicated Claimant exhibited tremors in the upper and lower extremities and muscle spasms over the upper extremities, lower extremities, and spinal areas. *Id*. Dr. Sing testified that he contacted Dr. Farmer, Claimant's neurologist, to discuss medications and treatment options for Claimant. *Id*.

Dr. Sing diagnosed Claimant with cervical dystonia and a functional movement tremor status post electrical injury. *Id*. at 334. According to Dr. Sing, Claimant was capable of working in a sedentary position but was not capable of physical labor such as climbing, crawling, or stooping. *Id*. Dr. Sing testified that in addition to his examinations of Claimant, he also reviewed records from Claimant's other medical providers. *Id*. at 335. According to his review of Dr. Farmer's records, Dr. Sing testified Dr. Farmer also diagnosed Claimant with cervical dystonia and a functional movement disorder, and that she provides Botox injections to Claimant to alleviate Claimant's muscle spasms. *Id*. at 336.

When asked whether he believed Claimant's tremors were voluntary or involuntary, Dr. Sing stated: "In my opinion, they're involuntar[y]. I've seen him on multiple occasions and these are involuntary." *Id*. at 339. When asked about a notation in Dr. Farmer's notes that she observed Claimant did not have a tremor when he put on his hat in her office, Dr. Sing explained:

> Significant to that is that a patient can – when you are having the involuntary spasms and the involuntary shaking, a patient can override the shaking by stopping it on purpose or performing a motion, where – you understand, in dystonic motion, the firing from the brain and from the spinal cord is disjointed. It's all coming out at the same time versus

4

an active motion like putting on your hat where your brain is now coordinating all the muscles, so the shaking stops until you put your hat on. And once you relieve the responsibility of the hand after putting the hat on, you go back to the shaking. So you can override that by an active motion.

*Id*. at 340. Additionally, when asked how the electric shock led to cervical dystonia, Dr. Sing explained:

When the electrical shock went into his body, it entered the neck and got to the spinal cord. He had a shock . . . . [T]he cycle completed on the electric circuit that caused him to receive an electrical blow to his system. Generally, it follows nerves. Injured his neck, causing the dystonia and the severe spasms in his neck. Didn't cause any herniations. Causing the neck and the head to become movement disordered. Then he developed the other spasms and the other dystonia secondary to the pain in his neck and what resulted is increased stressors that are attributed to his inability to perform as he has in the past, his inability to perform his pleasurable activities like football coaching, his inability to provide for his family.

All these things as a result of the uncontrollable shaking that he continues to suffer from all started by the electrical injury that impacted his nervous system.

*Id*. at 357-58.

Dr. Sing acknowledged Claimant's 2013 electrocution, but he nonetheless believed Claimant's injuries were related to the 2018 shock. *Id*. at 359. Dr. Sing conveyed:

The 2013 shock was there, but [Claimant] was able to continue to work and it didn't interfere with anything according to what he described to me. And this is a face-to-face description.

The 2013 incident caused intermittent tremors and shaking, but nothing that interfered with his ability to function and work.

This time after the 11/28/2018 incident now he's got so much pain in his neck from the spasm in his neck that was caused – in my opinion to

5

a reasonable degree of medical certainty – from the electrical shock that went through his system. It focused into his neck.

The rest of it, as I said, I believe is functional. And I think that the upper and lower extremity tremors are a result of his inability to cope with what's going on with his neck and associates with the pain that the patient complains of that is being generated from his neck.

*Id.*

In detailing how the electrical shock injured Claimant's neck, Dr. Sing stated:

The cervical spine. Because the electrical shock went in and damaged and caused such a spasm in his cervical spine when it hit him. It's not just the neck. It's the spine itself. It's the muscles and the tendons and the soft tissues on the outside, which is causing his recurrent spasms and ongoing spasms and dystonic spasms in his neck.

*Id.* at 360.

In support of its position that Claimant did not suffer a work-related injury, Employer presented the testimony of David Buchholz, M.D. (Dr. Buchholz), a board-certified neurologist, who performed an independent medical evaluation (IME) on Claimant. *Id.* at 433. Dr. Buchholz explained that during his examination, Claimant

had bizarre abnormal movements. He constantly wriggled, fidgeted, twitched throughout his body, in a manner completely unrecognizable in terms of identifiable neurological condition.

Movement disorders- and they can be of various forms. Tremor is most common, which is a rhythmic shaking of some body part, typically the upper extremities, or in some cases there are sort of so-called ballistic movements where somebody will have a sudden jerk or a sustained series of jerks.

There can be what I earlier referenced as dystonia where there is sustained abnormal involuntary muscle contraction, for example, around the neck, but it can involve limbs as well where the affected

6

body part is abnormally postured or deviated on a sustained basis. It's not a rhythmic or jerky kind of condition.

So the hallmarks of legitimate, bona fide involuntary movement disorders are that they are stereotypical in a given individual. That is, whatever the movement disorder is, it tends to be consistent and repeated over time, it's not markedly fluctuating or variable.

And the other hallmark is that genuine movement disorders are not distractable. That is, when you engage a person in some manner and they become focused on something being discussed or done, the abnormal movements, if they are of legitimate neurological origin, persist.

Whereas adversely, the indicators of a non-neurological movement disorder, what might be called psychogenic movement disorder; that is, it doesn't have a neurological basis, it's something generated in that person's mind on an emotional or psychological basis, they tend to be non-stereotypical; that is, highly variable in their appearance, and distractible.

Both were true of [Claimant]. These movements varied throughout the nearly two and a half hours we met, and he did have reduced movements when he became occupied in something; that is, when he became distracted.

He notably had no increased muscle activity, no . . . hypertonicity; that is excessive muscle tone. You might also call it spasm. He had none of that around the neck. Also importantly, he had no hypertrophy or enlargement of muscles around the neck.

Typically, if somebody has dystonia, which is this prolonged, sustained involuntary muscle contraction, the muscles that are involved become bigger, . . . they become hypertrophied, for the same reason that if you worked out a lot the muscles you're working out would become bigger. He had none of that. There was no abnormality whatsoever of the muscles around his neck; his cervical spine active range of motion was full; and he had no objective neurological abnormality.

His routine gait was odd. It was very clumsy and awkward but on a narrow base, meaning he did not widen his stance as does someone who has imbalance in order to not fall.

And specific balance testing was completely normal, including he was able to walk on his heels, he was able to walk on his toes, he could walk in tandem fashion one foot directly in front of the other, and he was able to stand with his feet together and close his eyes and maintain his balance.

*Id*. at 453-55.

When asked how he would characterize his physical examination of Claimant, Dr. Buchholz indicated it was neurologically normal, but noted "what was striking were [Claimant's] bizarre, unrecognizable movements that he exhibited throughout the encounter in a clearly non-neurological, psychogenic pattern." *Id*. at 455. Dr. Buchholz indicated he believed Claimant's movements were "subjective and effort-dependent. That is, it's something that he was generating, he was producing." *Id*. Dr. Buchholz opined he did not observe anything during his physical examination to explain Claimant's movements. *Id*. Dr. Buchholz indicated he did not believe Claimant's movements were spasms, and he also did not believe Claimant's gait was impaired because, although Claimant's gait was clumsy and awkward, he was capable of difficult gait techniques. *Id*. at 457.

Ultimately, Dr. Buchholz opined Claimant did not suffer any neurological injury as a result of the 2018 electrocution, and his abnormal movements were psychogenic, and neither caused nor aggravated by the incident at work. *Id*. at 492. Further, he disagreed with Dr. Sing's and Dr. Farmer's diagnoses of Claimant's dystonia. *Id*. When asked why he believed Claimant did not suffer any neurological injury during the 2018 electrocution event, Dr. Buchholz stated: "The event seemed to have been a nonevent. He went to the nurse at work right after and was deemed fine to return to work. He himself brushed it off as having been seemingly minor, denied any pain." *Id*. at 493. In Dr. Buchholz's opinion, Claimant suffered from psychogenic movement disorder, which was neither caused nor aggravated by the

8

2018 work incident. *Id.* Dr. Buchholz testified he believed as of the date of his IME, Claimant was fully and completely recovered from any electrical shock that took place at work. *Id.* at 495.

Employer also submitted the deposition testimony of Diane Volpe, Employer's occupational health nurse (Employer's Nurse). *Id.* at 680. According to Employer's Nurse, Claimant reported to occupational health for the electrical shock he sustained in 2013, and the electrical shock he sustained in 2018 at work. *Id.* at 688. After the 2018 incident, Employer's Nurse checked Claimant's vitals, which were all normal. *Id.* at 689. Employer's Nurse testified Claimant sat with her for approximately 30 minutes and then returned to work. *Id.* Employer's Nurse testified that in January 2021, Claimant reported to her he was seeing Dr. Farmer for his involuntary shaking, back pain, and weight loss, which were all worsening over time, and Dr. Farmer diagnosed him with functional neurological trauma, but Claimant denied any trauma. *Id.* at 746. According to Employer's Nurse, Claimant mentioned the only trauma he could think of was when he had the electrical shock in 2018. *Id.*

Finally, Employer submitted surveillance video footage of Claimant on the following dates: August 10, 2022, August 15, 2022, September 10, 2022, and September 12, 2022. *Id.* at 735. The footage purported to show Claimant sitting outside of his business without shaking or tremoring. *Id.*

After reviewing the evidence submitted, the WCJ found Claimant credible based on his observation of Claimant's testimony and the fact that Claimant's complaints were entirely consistent with the testimony and opinions of Dr. Sing. *Id.* at 55-56. Further, the WCJ found Dr. Sing credible and accepted his diagnosis of Claimant's cervical dystonia and functional movement tremor status post electrical

9

injury. *Id*. The WCJ indicated Dr. Sing's testimony was supported by Claimant's credible testimony, medical records, and his clinical observations of Claimant. *Id*. The WCJ found Employer's Nurse's testimony established Claimant reported his injury on the day it occurred, and Employer was on notice at least as of January 20, 2021. *Id*. at 55. Regarding the surveillance video footage, the WCJ found the footage showed Claimant outside of his store sitting throughout most of the videos, which was consistent with Claimant's testimony regarding his involvement with the business. *Id*. The WCJ noted Claimant did not appear to be shaking in the videos. *Id*. Ultimately, the WCJ concluded Claimant satisfied his burden of proving he sustained a work-related injury in the course and scope of his employment on November 28, 2018, in the form of cervical dystonia and a functional movement tremor status post electrical injury. *Id*. at 56. Thus, the WCJ granted Claimant's Claim Petition, and directed Employer to pay Claimant temporary total disability benefits as of January 14, 2021, and ongoing. *Id*. Employer appealed to the Board.

The Board explained that questions of credibility and evidentiary weight are for the WCJ, and based on the WCJ's credibility determinations, the Board concluded Claimant established a work injury on November 28, 2018, in the nature of a cervical dystonia and functional movement tremor status post electrical injury, which disabled him as of January 14, 2021. *Id*. Regarding notice, the Board indicated the burden was on Claimant to establish timely and adequate notice of a work-related injury, and the WCJ accepted Claimant's testimony that he reported not only the electrocution incident, but also his symptoms to Employer. *Id*. at 89. Additionally, the Board noted the WCJ found Employer's Nurse's testimony established Claimant reported his injury the day it occurred. *Id*. The Board pointed out that separate notice of his specific condition was not required as it was sustained

10

in the accident at work, which was reported to Employer in a timely manner. *Id*. Ultimately, the Board believed Employer was asking it to reweigh the evidence, but it declined to do so as questions of weight and credibility are for the WCJ. *Id*. at 90. Regarding Employer's argument that the WCJ erred by not allowing it to obtain Claimant's psychiatric records, the Board rejected that argument because Claimant did not assert a psychological injury, and Employer was able to submit the testimony of Dr. Buchholz's opinion Claimant's injury was psychological and not work related, and because there was no evidence of bias or ill will in the WCJ's decision not to release psychological documents. *Id*. at 91. Finally, regarding Employer's argument that the WCJ erred by failing to award a credit for short-term and long-term disability benefits paid to Claimant, the Board noted the WCJ made no dispositive determinations in this respect, and it remanded to the WCJ, without the need for further hearing, testimony or evidence, to determine Employer's entitlement, if any, to a credit for short and/or long-term disability benefits. *Id*. at 92. Otherwise, the Board affirmed the WCJ's grant of Claimant's Claim Petition.[3]

Employer now appeals to this Court. On appeal, Employer argues the WCJ's Decision and Board's Order were not supported by substantial competent evidence and the WCJ capriciously disregarded evidence in determining Claimant provided timely notice of his work injury to Employer. Employer's Br. at 8. Additionally, Employer contends Dr. Sing's testimony was not qualified or competent, and it did not provide substantial evidence upon which the WCJ or Board could grant Claimant's Claim Petition. *Id*. Further, Employer asserts the WCJ and Board capriciously disregarded competent evidence including, but not limited to, "the lack

---

[3] Upon remand, the WCJ found Employer was entitled to a credit for short-term and long-term disability benefits paid, which could be taken as an offset against future indemnity benefits. *Id*. at 101. The Board then affirmed.

of a significant work event, delay in treatment, delay in symptoms, delay in disability, delay in notice, delay in Claimant notifying medical providers of the work event, testimony of [Dr. Buchholz] and/or the surveillance." *Id*. Finally, Employer contends the Board erred by upholding the WCJ's ruling that Claimant did not have to sign an authorization or otherwise release his psychological records. *Id*.

## DISCUSSION

This Court reviews workers' compensation orders for violations of a party's constitutional rights, violations of agency practice and procedure, and other errors of law. 2 Pa.C.S. § 704. We also review whether substantial evidence supports the findings of fact necessary to sustain the Board's decision. *Id.* The WCJ is the ultimate fact finder in workers' compensation cases and is entitled to weigh the evidence and assess the credibility of witnesses. *Montano v. Advance Stores Co., Inc. (Workers' Comp. Appeal Bd.)*, 278 A.3d 969, 978 n.4 (Pa. Cmwlth. 2022) (citation omitted). Whether the record contains evidence to support findings other than those made by the WCJ is irrelevant; the critical inquiry is whether the record supports the findings actually made, and we must view the evidence in the light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced therefrom. *A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013). In reviewing issues concerning the Act, we are mindful the Act is remedial in nature and its purpose is to benefit the workers of the Commonwealth. *Tooey v. AK Steel Corp.*, 81 A.3d 851, 858 (Pa. 2013). Accordingly, we construe the Act liberally to effectuate its humanitarian objectives, and we resolve borderline interpretations in favor of the injured party. *Id*. (citation omitted). With these guidelines in mind, we review Employer's issues on appeal, although not in the order Employer presented them.

12

**Timeliness of Notice**

First, we address Employer's assertion that Claimant failed to establish he provided Employer timely notice of his work injury. Employer's Br. at 12. As a prerequisite to receiving workers' compensation benefits, a claimant bears the burden of proving he gave adequate notice of a work injury to his employer. *East Hempfield Twp. v. Workers' Comp. Appeal Bd. (Stahl)*, 189 A.3d 1114, 1117 (Pa. Cmwlth. 2018). Ultimately, what constitutes adequate notice under the Act is "a fact-intensive inquiry, taking into consideration the totality of the circumstances." *Gentex Corp. v. Workers' Comp. Appeal Bd. (Morack)*, 23 A.3d 528, 537 (Pa. 2011). Whether a claimant has complied with the Act's notice requirements is a question of fact to be determined by the WCJ. *City of Phila. v. Workers' Comp. Appeal Bd. (Wilson)*, 767 A.2d 26, 29 (Pa. Cmwlth. 2001).

Sections 311 and 312 of the Act govern the timing and content of a claimant's notice. *See* 77 P.S. §§ 631-632. Section 311 of the Act provides that unless an employer has knowledge of the work injury, an employee must give his employer notice of a work injury within 120 days of its occurrence. 77 P.S. § 631. Where the injury and its connection to a claimant's employment is not known, Section 311's notice period does "not begin to run until the employe knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment." 77 P.S. § 631. Therefore, with regard to notice under Section 311, the question is when the claimant, "through the exercise of reasonable diligence, should have known the work-relatedness of his injury." *Stahl*, 189 A.3d at 1120. Reasonable diligence requires "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Id*. at 1114.

13

Section 312 of the Act requires notice "inform the employer that a certain employe received an injury, described in ordinary language, in the course of his employment on or about a specified time, at or near a place specified." 77 P.S. § 632. The employee need not provide employer with an exact diagnosis of a work-related injury, but rather, a reasonably precise description of the injury is sufficient. *Gentex*, 23 A.3d at 536. The notice should "be conveyed in ordinary language, can take into consideration the context and setting of the injury, and may be provided over a period of time or a series of communications, if the exact nature of the injury and its work-relatedness is not immediately known by the claimant." *Id*. at 537.

Importantly, a claimant is not required to give notice in a single communication, and conversations between a claimant and an employer are not considered in isolation. *Id*. Indeed, such "an approach would too narrowly focus on individual conversations and events, while ignoring the context in which they occurred and the cumulative effect of such conversations." *Id*.; *see also Kocher's IGA v. Workers' Comp. Appeal Bd. (Dietrich)*, 729 A.2d 145, 149 (Pa. Cmwlth. 1999) (claimant complied with the Act's notice requirements where she initially complained to her supervisor of an injury, which kept her out of work, but only informed her employer that the injury was work related several months later after she received that information from her physician). In considering whether adequate notice has been provided to an employer, the context of the communications between the claimant and the employer concerning the work-related injury is relevant. *See City of Erie v. Workmen's Comp. Appeal Bd. (Shannon)*, 607 A.2d 327 (Pa. Cmwlth. 1992) (where claimant suffered a heart attack at home and never informed his employer his injury was or may have been related to his employment, claimant denied benefits); *but see Dietrich,* 729 A.2d at 149 (court noted that, although the

14

claimant was not sure if her injury was work related at the time of the injury, the employer was aware of the injury and the possibility it was work related due to the claimant being injured while at work and immediately informing her supervisor).

Employer argues this case is similar to our Court's decision in *Hershey Company v. Woodhouse (Workers' Compensation Appeal Board)*, 300 A.3d 529 (Pa. Cmwlth. 2023), which we decided after the Board issued its Order in this case. In *Hershey*, the claimant had a preexisting diabetic foot ulcer, which required him to wear special footwear. *Id*. at 530. However, because the claimant worked in the food industry, his employer did not permit him to wear the recommended footwear during work. *Id*. Additionally, the claimant's employer did not permit him to sit down while working. *Id*. After a brief absence, the claimant returned to work with the restriction that he wear regular shoes because of his foot ulcer. *Id*. Upon his return, the claimant passed out at work, and subsequently underwent emergency foot surgery, and then a below-the-knee amputation of his right leg. *Id*. The claimant notified his employer of the emergency surgery but made no mention that it was work related or caused by standing for long periods of time while at work. *Id*. More than a year and a half later, the claimant filed a claim petition arguing that his injury was work related. *Id*. At a hearing before the WCJ, the claimant testified he knew his injury was work related as soon as it happened but admitted he did not communicate this belief to his employer. *Id*. at 535. The WCJ granted the claim petition as to some of the claimant's injuries, but not as to the below-the-knee leg amputation because the WCJ found claimant failed to afford his employer notice of that injury. *Id*. On appeal, the Board reversed, finding the employer had "constructive notice" as to the full extent of the claimant's injuries. *Id*. This Court reversed the Board, noting that the purpose of Section 311's notice provision is to

protect the employer "from stale claims for accidental injuries of which [the employer] would have no knowledge, made after the opportunity had passed for a full and complete examination thereof." *Id*. at 533. Additionally, we explained:

> This is not a case where the series of communications can provide the required notice . . . because [the claimant]: (1) knew that he suffered a work-related injury in November 2017; (2) knew that he was to immediately report suspected work-related injuries to his supervisor; and (3) sent an email to [the employer] within the required 120 days without stating, or in any manner indicating, that his injury was work related.

*Id*. at 537.

In contrast, after *Hershey*, we addressed *Power Home Remodeling, Inc. v. Hess (Workers' Compensation Appeal Board)*, (Pa. Cmwlth., No. 1303 C.D. 2023, filed October 8, 2024),[4] wherein we distinguished from the *Hershey* decision. In *Hess*, the claimant suffered severe injuries following an all-terrain vehicle accident. Slip op. at 1. There was no dispute that the employer was provided timely notice of the occurrence of the accident and the claimant's injuries. *Id*. at 3. To that end, the employer flew the claimant's mother out to the hospital where the claimant was receiving treatment and provided lodging for the claimant's family so they could visit him while he was treated for his severe injuries. *Id*. Regarding notice, the employer argued Section 311 of the Act requires a claimant to afford notice of an injury within 120 days of the date of the injury and it asserted the claimant failed to notify the employer that he suffered a workplace injury. *Id*. The employer maintained that its conduct after the claimant's injury was merely a courtesy, and it

---

[4] Unreported memorandum opinions of this Court issued after January 15, 2008, may be cited for their persuasive value. *See* Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

16

maintained the injury was not in the course and scope of employment. *Id*. at 7.

Regarding notice, this Court explained:

> Section 311 explicitly permits claimants to recover workers' compensation benefits, even in the absence of formal notice, where the employer has actual knowledge of the injury. As such, here, [the employer's] decision to fly [the claimant's] mother to the hospital where he was being treated and to book a hotel room for her to stay in pending his treatment belies [the employer's] arguments now because [the employer] necessarily had *actual knowledge* of [the claimant's] injury and the circumstances giving rise to it. Additionally, the instant matter is readily distinguishable from *Hershey* . . . because [the claimant's] contention that the injury was work related was not obfuscated by a preexisting condition. Rather, here, [the employer] had knowledge of the trip, its participants, [the claimant's] desire to recruit or promote these participants, and his resulting severe injuries. . . . For the same reasons, . . . we are persuaded that the totality of the circumstances indicate[s] that [the employer] was aware of [the claimant's] work trip and the severity of his injuries which provided [the employer] with sufficient notice under Section 312. Although his notice may have been imperfect, it still served as proper notice of injury under the Act.

*Id*. at 9.

Contrary to Employer's assertion that this case is similar to *Hershey*, we consider the facts of this case to be more analogous to *Hess* than *Hershey*. Here, the WCJ found, and the record supports, that Claimant reported his electrocution to Employer's Nurse on the date it occurred. Therefore, Employer had actual knowledge of Claimant's injury and the circumstances that gave rise to the injury. At the time he notified Employer of his electrocution, Claimant was understandably unaware of the full extent of the injuries he would suffer from that incident. Once Claimant learned that his ongoing symptoms could be related to trauma, and the only trauma he experienced was the electrocution, he reported this to Employer's Nurse. Thus, Claimant informed Employer's Nurse, in ordinary language, in January 2021, that he was suffering from additional symptoms that could be work related. The

17

context of the communications from Claimant provided Employer with information concerning the time and place of Claimant's injury, as it occurred while Claimant was at work. Claimant's further report to Employer's Nurse, therefore, provided Employer with a reasonable description of his injury.

Consistent with the humanitarian purpose of the Act, *Tooey*, 81 A.3d at 858, and construing the Act liberally in Claimant's favor, as well as giving proper deference to the WCJ's findings, we conclude Claimant satisfied the notification requirements of the Act. Accordingly, we discern no error by the WCJ or the Board in concluding Claimant provided sufficient notice of his injury to Employer.

### Psychological Records

Next, we address Employer's assertion that the Board erred and violated its due process rights by upholding the WCJ's ruling that Claimant need not sign an authorization or otherwise release his psychological records. Employer's Br. at 42. In support of this argument, Employer cites *Conestoga National Bank of Lancaster v. Patterson*, 275 A.2d 6 (Pa. 1971), for its contention that "[d]ue process of law applies to administrative proceedings. Due process involves notice, an opportunity to be heard and to defend in an orderly proceeding." Employer's Br. at 42-43. Employer contends that "without the prior psychological treatment records, [it] did not have an adequate opportunity to defend the Claim Petition." *Id*. at 43.

We agree with Employer's assertion that the constitutional guarantees of due process apply to proceedings before administrative tribunals. *Gow v. Dep't of Educ.*, 763 A.2d 528, 533 (Pa. Cmwlth. 1991) (citation omitted). The essential requirements of procedural due process are notice and an opportunity to be heard. *Id*. (citation omitted). While due process requires a tribunal to conduct "an orderly, regular proceeding appropriate to the nature of the case," *Fiore v. Board of Finance*

*and Revenue*, 633 A.2d 1111, 1114 (Pa. 1993), "constitutional procedural due process is a flexible concept, and thus, implicates procedural protections as each particular situation demands." *Chester Water Auth. v. Pa. Pub. Util. Comm'n*, 868 A.2d 384, 391 (Pa. 2005).

While a party in an administrative hearing must be given an opportunity to be heard, *Arnold v. Workers' Compensation Appeal Board (Lacour Painting, Inc.)*, 110 A.3d 1063, 1068 (Pa. Cmwlth. 2015), the WCJ has sound discretion over "matters of evidence taking, and the admission of testimony and exhibits." *Atkins v. Workers' Comp. Appeal Bd. (Stapley in Germantown)*, 735 A.2d 196, 199 (Pa. Cmwlth. 1999) (citation omitted). A WCJ is free to exclude evidence which it deems irrelevant, confusing, misleading, cumulative, or prejudicial. *Washington v. Workers' Comp. Appeal Bd. (State Police)*, 11 A.3d 48, 59 (Pa. Cmwlth. 2011) (citation omitted). We will not overturn a WCJ's determination regarding the admission or exclusion of evidence absent a showing of an abuse of discretion. *Id.* (citation omitted). A WCJ commits an abuse of discretion "where the WCJ's judgment is manifestly unreasonable, where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Allegis Grp. & Broadspire v. Workers' Comp. Appeal Bd. (Coughenaur)*, 7 A.3d 325, 327 (Pa. Cmwlth. 2010) (citation omitted).

In the present matter, we discern no violation of Employer's due process rights by the WCJ's decision to decline to force the release of Claimant's psychological records. Employer requested the WCJ compel Claimant to sign an authorization for the release of Claimant's psychological records. However, Claimant did not claim a work-related psychological injury. While Employer argued there was a psychological component to Claimant's physical symptoms, Employer submitted

19

the testimony of Dr. Buchholz who testified to his belief that Claimant's injuries were not work related and his opinion that Claimant's symptoms were nonorganic or psychological. Thus, Employer had the opportunity to and, in fact, did present evidence that Claimant's symptoms were not work related or due to Claimant's electrocution and, instead, were psychological. While the psychological records Employer sought would have been used to bolster this claim, Employer still had the opportunity to present this evidence. Therefore, we discern no abuse of discretion in the WCJ's decision not to require Claimant to permit Employer to obtain his psychological records, and no violation of Employer's due process rights.

## Substantial Competent Evidence

Next, we address Employer's assertion the WCJ erred by relying on Dr. Sing's testimony to grant Claimant's Claim Petition because his testimony did "not rise to the level of substantial competent evidence." Employer's Br. at 10.

A claimant has the burden of proving all elements necessary to support an award on a claim petition, including the existence of a work-related injury resulting in disability and its duration. *Dennis v. Inglis House (Workers' Comp. Appeal Bd.)*, 303 A.3d 559, 564 (Pa. Cmwlth. 2023). Where the causal relationship between the work incident and the disability is not obvious, competent medical evidence is necessary to establish the nexus. *Id.* (citation omitted). In cases involving medical testimony, competent evidence means "medical testimony which expresses unequivocality." *Roeberg Enter., Inc. v. Workmen's Comp. Appeal Bd. (Giddens)*, 400 A.2d 911 (Pa. Cmwlth. 1979). "[M]edical testimony is unequivocal if a medical expert testifies, after providing foundation for the testimony, that, in his professional opinion, he believes or thinks a fact exists." *O'Neill v. Workers' Comp. Appeal Bd. (News Corp., Ltd.)*, 29 A.3d 50, 58 (Pa. Cmwlth. 2011). On the other hand, medical

20

testimony is equivocal "if it is based only upon possibilities, is vague, and leaves doubt." *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg College)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2002). When reviewing the equivocality of medical testimony, we consider the testimony in its entirety rather than a few words taken out of context. *Carpenter Tech. Corp. v. Workmen's Comp. Appeal Bd. (Wisniewski)*, 600 A.2d 694, 696 (Pa. Cmwlth. 1991) (citation omitted).

Our review of Dr. Sing's testimony, in its entirety, reveals an unequivocal, or in other words, an unquestionable, opinion of Claimant's diagnoses and the work-relatedness of his injuries. Dr. Sing diagnosed Claimant with cervical dystonia and a functional movement tremor status post electrical injury. C.R. at 334. Dr. Sing based his opinions upon his review of Claimant's medical records from various providers, his physical examinations of Claimant, and the medical history provided to him by Claimant. *Id*. at 335. Dr. Sing observed Claimant with uncontrollable shaking and tremors of extremities, sometimes stuttering with a shaky voice, pain, muscle spasms, and chronic fatigue. *Id* at 328. When asked whether he believed Claimant's tremors were voluntary or involuntary, Dr. Sing stated: "In my opinion, they're involuntar[y]. I've seen him on multiple occasions and these are involuntary." *Id*. at 339. Dr. Sing explained how the 2018 electrical shock led to cervical dystonia and acknowledged Claimant's 2013 electrocution incident but explained he still believed Claimant's injuries related to the 2018 electrocution. *Id*. at 359. Finally, Dr. Sing testified that all of his opinions were given with a reasonable degree of medical certainty. *Id*. at 345-46.

Upon review of Dr. Sing's testimony in its entirety and in context, it is clear that Dr. Sing did not waver in his opinion that Claimant's cervical dystonia was caused by the 2018 electrocution he suffered at work. Dr. Sing's testimony was not

21

uncertain, vague, or doubtful, and thus was unequivocal. Accordingly, Employer's argument that Dr. Sing's testimony did not rise to the level of substantial competent evidence is without merit.

Moreover, Employer's assertion that Dr. Sing's testimony is incompetent under the Pennsylvania Supreme Court's decision in *Newcomer v. Workmen's Compensation Appeal Board (Ward Trucking Corporation)*, 692 A.2d 1062 (Pa. 1997), likewise lacks merit. In *Newcomer*, a claimant's medical expert testified that the claimant's workplace accident was the cause of the claimant's shoulder disability. *Id*. at 1063. The medical expert acknowledged that he had not reviewed any of the hospital records relating to the claimant's original injury and had not been involved in any of the treatment that immediately followed the injury. *Id*. The medical expert indicated "he based his opinion solely and *expressly* on the medical history provided by" the claimant. *Id*. (emphasis in original). However, upon review of the record, the Court determined the claimant provided a false medical history to the medical expert. *Id*. at 1064. The Court noted that "[w]hile an expert witness may base an opinion on facts of which he has no personal knowledge, those facts must be supported by evidence of record." *Id*. at 1066 (citation omitted). The Court explained the medical expert's testimony was

> incompetent in that it was unsupported by the medical record and by the factual history of the accident. The description of the accident provided to [the medical expert] was patently different from that which was the basis for treatment at the time of the injury. [The claimant] was treated for an abdominal injury. For two and one-half years thereafter, he received absolutely no treatment for any shoulder problem. [The medical expert's] opinion as to causation was based solely on [the claimant's] representation that he suffered the shoulder injury in the work-related accident. The medical records of treatment following the accident simply do not support [the claimant's] claim. In short, [the claimant's] personal opinion of causation was the sole basis for [the

22

medical expert's] expert opinion. The expert opinion lacked, therefore, a competent foundation in the evidence of record.

*Id*.

By way of contrast, here, there is no reason for us to conclude Claimant lied to Dr. Sing and provided a false medical history or a false account of his electrocutions. The WCJ found Claimant and Dr. Sing credible and noted Claimant's complaints were entirely consistent with the testimony and opinions of Dr. Sing. *See* C.R. at 55-56. Further, unlike the medical expert in *Newcomer*, Dr. Sing did not rely "solely and expressly" on the medical history provided by Claimant. Rather, Dr. Sing relied on Claimant's medical records from various providers, his physical examinations of, and interactions with, Claimant, and the medical history Claimant provided him. C.R. at 335. Dr. Sing's opinions, therefore, rested on a competent foundation in the evidence of record. Thus, this case is distinguishable from *Newcomer*. Accordingly, we conclude the WCJ did not err in relying on Dr. Sing's medical testimony as substantial support for his finding of a causal relationship between Claimant's 2018 work injury and his disability.

## Capricious Disregard

Finally, Employer argues the WCJ capriciously disregarded "multiple pieces of uncontradicted evidence" including

> medical doctors reports where there is no reference of the work injury, almost two hours of surveillance evidence, not one neurologist indicating that Claimant's problems were work related, Claimant failing to tell four different medical providers on 14 separate occasions that the problem was work related, Claimant continuing to work for over two years after the work injury without physical limitation or restriction and on a full time basis.

Employer's Br. at 10-11.

A "capricious disregard" of evidence is a "deliberate disregard of competent evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Leon E. Wintermeyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 n.12 (Pa. 2002). We are mindful that the capricious disregard standard of review is "not to be applied in such a manner to intrude on the agency fact-finding role and discretionary decision-making authority." *Hughes v. Wawa, Inc. (Workers' Comp. Appeal Bd.)*, (Pa. Cmwlth., No. 826 C.D. 2021, filed August 8, 2022). A capricious disregard of evidence occurs when there is a "willful, deliberate disbelief of an apparently trustworthy witness, whose testimony one has no basis to challenge." *Gallo v. Workmen's Comp. Appeal Bd. (United Parcel Serv.)*, 504 A.2d 985, 988 n.2 (Pa. Cmwlth. 1986). To be capricious, a WCJ's decision must not be merely an error in judgment, but "the adjudication must be so flagrant as to be repugnant to a man of reasonable intelligence." *Giant Eagle, Inc. v. Workmen's Comp. Appeal Bd. (Bensy)*, 651 A.2d 212, 217 (Pa. Cmwlth. 1994) (quotation omitted). Thus, a capricious disregard occurs when the WCJ deliberately ignores relevant, competent evidence. *Amazon.com Servs. LLC v. Roman (Workers' Comp. Appeal Bd.)*, (Pa. Cmwlth., No. 185 C.D. 2022, filed December 1, 2022) (citation omitted). Notably, "where there is substantial evidence to support [a WCJ's] factual findings, and those findings in turn support the conclusions, it should remain a rare instance in which an appellate court would disturb an adjudication based upon capricious disregard." *Marlowe*, 812 A.2d at 487 n.14.

Here, the WCJ considered and compared the medical testimony of Employer's expert, Dr. Buchholz, and Claimant's expert, Dr. Sing, at length. C.R. at 66-70. The experts offered conflicting evidence regarding Claimant's injuries and the work-relatedness of his injuries. The WCJ identified and reviewed the evidence and

24

discussed the rationale for each finding of fact and conclusion of law. Ultimately, the WCJ found Dr. Sing's testimony to be more credible and persuasive than Dr. Buchholz's testimony. *Id.* In making this determination, the WCJ explained Dr. Sing was "credible and convincing" and noted Dr. Sing's testimony was "supported by [C]laimant's credible testimony, medical records and his own clinical observations." *Id*. at 72. Furthermore, the WCJ found Claimant "credible and convincing," and explained this was based on his "observation of Claimant's testimony and the fact that [Claimant's] complaints [were] entirely consistent with the testimony and opinions of Dr. Sing." *Id*. at 71.

Despite Employer's argument to the contrary, the WCJ acknowledged the conflicting medical testimony, the surveillance footage, and the two years Claimant worked after the 2018 electrocution as his symptoms progressed, *see id*. at 64-72, and the WCJ's findings were supported by substantial evidence of record. The WCJ assessed the conflicting medical testimony and found Claimant's medical witness to be more credible than Employer's medical witness regarding Claimant's injuries and their work-relatedness. The WCJ did not capriciously ignore relevant competent evidence in rendering his decision. Insofar as Employer seeks to have this Court reweigh the evidence, the WCJ, as the factfinder, has the sole authority to assess credibility, to resolve conflicting evidence, and to determine the weight given to the evidence. *Hoffmaster*, 721 A.2d at 1155-56. We will not apply the capricious disregard standard in a way that would intrude on the WCJ's fact-finding and discretionary decision-making role. *Marlowe*, 812 A.2d at 487-88. Accordingly, we discern no error by the Board in affirming the WCJ's Decision.

25

**CONCLUSION**

For the above reasons, we affirm the Board's Order.

_____
STACY WALLACE, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kimberly-Clark Mill,        :
              Petitioner      :
                                       :
      v.                      : No. 1371 C.D. 2024
                                       :
William Moss, Jr. (Workers'    :
Compensation Appeal Board),    :
              Respondent    :

**O R D E R**

**AND NOW**, this 12th day of August 2025, the Workers' Compensation Appeal Board's September 24, 2024 order is **AFFIRMED**.

_____
STACY WALLACE, Judge